In re **SACRED HEART HOSPITAL OF NORRISTOWN d/b/a Sacred Heart Hospital and Rehabilitation Center, Debtor.**

**Bankruptcy No. 94–13275DAS.**

United States Bankruptcy Court,
E.D. Pennsylvania.

Sept. 28, 1995.

Vincent J. Marriott, III, Ballard Spahr Andrews & Ingersoll, Philadelphia, PA, for Debtor.

Daniel T. McGrory, Pizonka, Reilley & Bello, P.C., King of Prussia, PA, for Borough of Norristown.

Neal D. Colton, Dechert Price & Rhoads, Philadelphia, PA, for Creditors' Committee.

Robert Lapowsky, Cohen, Shapiro, Polisher, Shiekman & Cohen, Philadelphia, PA, for AllMed Financial Corp.

John J. Korseko, V, Koresko & Noonan, Norristown, PA, for certain former employees of Debtor.

Claudia Z. Springer, Duane, Morris & Heckscher, Philadelphia, PA, for Municipal Bonds Investors Insurance Company.

J. Gregg Miller, Pepper, Hamilton & Scheetz, Philadelphia, PA, for Midlantic Bank.

Frederic Baker, Ass't U.S. Trustee, Philadelphia, PA.

## OPINION

DAVID A. SCHOLL, Chief Judge.

### A. INTRODUCTION

The instant dispute requires this court to apply the holding in *Pioneer Investment Services Co. v. Brunswick Associates L.P.,* —— U.S. ——, 113 S.Ct. 1489, 123 L.Ed.2d 74 (1993), to the case of a municipal creditor which belatedly filed a priority tax claim because it allegedly did not discover the Debtor's pre-petition obligation until after the bar date. Finding little, if any, prejudice to the Debtor, we will allow the claim because, although the reason for the delay is

not totally convincing, the equities are sufficient to meet what we find are the liberal *Pioneer* standards.

## B. PROCEDURAL AND FACTUAL HISTORY

SACRED HEART HOSPITAL OF NORRISTOWN d/b/a SACRED HEART HOSPITAL AND REHABILITATION CENTER ("the Debtor") filed a voluntary bankruptcy petition on May 25, 1994, a week after it discontinued its role as a provider of medical services to the environs of the community in which it was located, the Borough of Norristown ("the Borough"). This case has been fairly complex and has resulted in four published Opinions of this court, reported at, dated, and holding, respectively: 182 B.R. 413 (May 17, 1995) (the Debtor's liquidating plan is confirmed) ("*Sacred Heart III*"); 181 B.R. 195 (April 19, 1995) (the Debtor's lawsuit seeking certain reimbursements from Blue Cross was referred, at least initially, to arbitration); 177 B.R. 16, 18–19 (February 1, 1995) (a motion of certain former employees to file a class proof of claim and to extend the bar date as to them was denied) ("*Sacred Heart II*"); and 175 B.R. 543, 546–48 (December 4, 1994) (a home health care service provider was not allowed to assert a trust against certain of the Debtor's accounts receivable) ("*Sacred Heart I*").

The facts which can be gleaned from the above-referenced Opinions which are relevant to the instant dispute are as follows: (1) the Borough attempted to frustrate the sale of the Debtor's facility to Montgomery County on September 1, 1994, by filing a condemnation action, which resulted in an injunction against the Borough based upon our finding that its action violated the automatic stay (Order of September 14, 1994, in Adversary No. 94–0666DAS). *See Sacred Heart I*, 175 B.R. at 546; (2) a bar date for filing claims was established on December 30, 1994, notice of which was sent to all known creditors and published in the Norristown *Times Herald* and the *Philadelphia Inquirer* in October, 1994. *See Sacred Heart II*, 177 B.R. at 19–20; and (3) this case having been in a liquidation mode since it was filed, *Sacred Heart I*, 175 B.R. at 546, the Debtor's confirmed plan was essentially one of liquidation. *See Sacred Heart III*, 182 B.R. at 415. The only appeal from the confirmation Order, by AllMed Financial Corporation ("AllMed"), has been dismissed pursuant to a settlement between AllMed and the Debtor approved by this court on August 30, 1995. Only when the claims objection procedure, commenced on June 9, 1995, and finished as to all but a few claims other than that at issue, is completed will distribution presumably be made.

Although obviously acutely aware of the Debtor's bankruptcy filing in light of its attempt to thwart the bankruptcy sale of the Debtor's facility, and not claiming failure to receive notice of the bar date because the Debtor listed it as a creditor owed an undisputed priority claim in the amount of $1,120.332 on its Schedules, it was not until April 17, 1995, that the Borough filed a proof of claim docketed at No. 516 ("the Claim"), asserting a priority tax claim in the amount of $54,488.18. The claim arises from unpaid local earned income taxes ("EIT Taxes"). The EIT Taxes are a product of the wages earned by the Debtor's employees for the relevant quarters. The Borough now acknowledges that the said amount is overstated, and the parties agree that the actual claim is $40,165.37.

The Debtor's objection to the claim ("the Objection") was heard on September 6, 1995. The only witness for the Debtor was its sole present employee, its past chief financial officer and current President, Terrence Cunningham. Cunningham presented documentation establishing that the Debtor filed prompt and timely returns for EIT Taxes for the first, third, and fourth quarters of 1994, and remitted the respective taxes reflected thereon, in the amounts of $51,878.80, $2,246.91, and $575.72, respectively. However, as to the second quarter of 1994, since the Debtor commenced this case in the midst of that quarter, the Debtor, in order to comply with the guidelines of the United States Trustee's office, was obliged to file *two* returns for such quarter, one covering the prepetition portion, and one covering the postpetition portion. The Borough acknowledges that the Debtor filed a return for the postpetition portion of the second quarter of 1994

("the Post–Petition Return"), labeled on its face as "Post Petition," and remitted the tax reflected thereon in the amount of $362.77.

The Debtor did not, however, remit payments for EIT Taxes arising during the pre-petition portion of the second quarter of 1994, the only tax period in issue. Rather, an employee of its financial office, Charles V. Wieand, sent a pre-petition return, labeled as "Pre Petition" and signed and dated on October 12, 1994, by Cunningham ("the Pre–Petition Return"), to Janine Arnaiz of the Municipal Tax Bureau ("the MTB") under cover of a letter dated October 8, 1994, which states that the remittance was made pursuant to a telephone discussion with Arnaiz of that date.

The only witnesses for the Borough were Joseph E. Schmanek, the director of the MTB since January 1995, and Arnaiz. Schmanek testified that the MTB performed municipal tax collection services for numerous local municipalities, including the Borough; that it never received the Pre–Petition Return; and that it was unaware that the Debtor had any delinquency, in light of the MTB's receipt of the Post–Petition Return for the second quarter of 1994, until it did an "annual reconciliation" of the Debtor's returns in February 1995.

Arnaiz testified that she was employed by the MTB as a "discovery caseworker," i.e., an investigator of businesses which fail to file returns. She did not recall any discussion with Wieand, nor any receipt of mail from him or the Debtor, indicating that her duties would not ordinarily bring her in contact with a consistent filer like the Debtor. However, she did indicate that her rather unusual name and mailing address were correctly designated on the copy of Wieand's letter. She also stated that mail such as the letter enclosing the Pre–Petition Return would probably have been opened by mailroom employees and forwarded to MTB's "taxpayer administration" rather than to her.

Wieand did not testify. While having no recall of the sequence of events, Cunningham suggested that Wieand may have written and dated the letter prior to his own subsequent execution of the Pre–Petition Return as a possible explanation for the discrepancy in the dates.

The Borough submitted a Memorandum of Law in support of its position at the close of the hearing, which indicated substantial reliance on this court's finding that it did not receive the Pre–Petition Return and hence had no knowledge of its potential claim until after the bar date. Both interested parties were granted permission to simultaneously file post-hearing briefs on September 15, 1995, which they did.

In its supplemental submission, the Borough alternatively argued that, even if the Pre–Petition Return had been received, the "confusion" arising from the submission of this Return constituted an "excuse" for its "neglect" of the bar date, and that the Debtor had established no prejudice which would result from allowing the late filing of its proof of claim. Indeed, the Debtor, in its submission, articulated no prejudice, but conceded a liability of $40,165.37, which it claimed that the Borough should be barred from recovering because the Debtor made all of the necessary filings and that the MTB's loss of its Pre–Petition Return and failure to investigate the Debtor's circumstances, in light of its bankruptcy, constituted neglect which was inexcusable.

## C. DISCUSSION

■ Federal Rule of Bankruptcy Procedure ("F.R.B.P.") 3003(c)(2) and (c)(3), taken together, require any creditor in a Chapter 11 case, except a creditor satisfied by the Debtor's listing of its claim designated as undisputed, to file a proof of claim on or before the court-established claims bar date in order to make a claim against a debtor's estate. However, F.R.B.P. 9006(b) allows certain time periods, including the F.R.B.P. 3003(c)(3) bar date, to be extended where the failure to timely act "was the result of excusable neglect."

In Chrysler Motors Corp. v. Schneiderman, 940 F.2d 911, 914–16 (3d Cir.1991), the Third Circuit Court of Appeals ("the Appeals Court") reiterated the restrictive standards for allowing "excusable neglect" to overcome an established claims bar date which had been previously set forth by the Appeals

Court in *In re Vertientes, Ltd.*, 845 F.2d 57, 60–61 (3d Cir.1988); and *In re Pigott*, 684 F.2d 239, 241–42 (3d Cir.1982) (interpreting comparable provision of the predecessor Bankruptcy Act), citing *Taylor v. Freeland & Kronz*, 938 F.2d 420 (3d Cir.1991), *aff'd*, 503 U.S. 638, 112 S.Ct. 1644, 118 L.Ed.2d 280 (1992). Although the Court affirmed the *Taylor* decision that bar dates for filing objections to claims of exemptions applied irrespective of the merits of a particular exemption claim, the Court, in *Pioneer*, did not cite *Taylor* in articulating an "excusable neglect" standard for allowance of the filing of proofs of claim beyond an established bar date which was significantly more liberal than that articulated by the Appeals Court in *Schneiderman*. Accord, *In re Beltrami Enterprises, Inc.*, 178 B.R. 389, 392 (Bankr.M.D.Pa.1994) (*Schneiderman* "spells out a significantly more conservative approach to the term 'excusable neglect'" than does *Pioneer*).

The Court, in *Pioneer*, articulated the appropriate F.R.B.P. 9006(b)(1) "excusable neglect" standard for extension of claims bar dates thusly, —— U.S. at ——, 113 S.Ct. at 1498:

> the determination is at bottom an equitable one, taking account of all relevant circumstances surrounding the party's omission. These include, . . . the danger of prejudice to the debtor, the length of the delay and its potential impact on judicial proceedings, the reason for the delay, including whether it was within the reasonable control of the movant, and whether the movant acted in good faith. . . . (footnotes omitted).

The aftermath of *Pioneer* has required rethinking of the standards for allowing extensions to bar dates by many bankruptcy courts, because several Courts of Appeals, like the Third Circuit Appeals Court, had previously adopted strict tests for "excusable neglect" in this context. *See* 9 COLLIER ON BANKRUPTCY, ¶ 9006.06, at 9006–20 to 9006–21 & nn. 2, 3 (15th ed. 1995); and Comment, *Equitable Standards of Excusable Neglect: A Critical Analysis of* Pioneer Investment Services Co. v. Brunswick Associates Limited Partnership, 11 BANKR. DEV.L.J. 181, 187–89 (1995).

It is our observation, in reviewing the post-*Pioneer* cases, that some courts are reluctant to let loose from the former strict standard and have attempted to limit the scope of the *Pioneer* holding to its facts, which emphasize that the particular bar date notice provided in that case was unclear, —— U.S. —— at ——–——, 113 S.Ct. at 1499–1500, rather than acceptance of that decision as working a significant change in the law by liberalizing the grounds on which an extension to a claims bar date should be allowed in any circumstances.

We do not believe that an approach which declines to liberally grant extensions of claims bar dates is warranted, in light of *Pioneer*. Rather, we believe that the full equities of the parties must be considered, and that the initial factors cited by the *Pioneer* court, *e.g.*, the danger of prejudice to the debtor and potential adverse impact of allowing a late claim on the debtor's reorganization process, are the polestars. The length of the delay and the presence of a claimant's conscious, tactical reason for the delay are also factors, but should be relevant largely in the context of prejudice to the debtor and its reorganization process. Thus, a tactical, bad faith delay which adversely affects the debtor's interests and reorganizational efforts, and a delay which has the same effect due to the length of time of the delay, would be likely to result in a denial of an extension. However, a long and logically unjustified delay which nevertheless has no significant impact on the debtor's case should, in our view, often be deemed excusable.

We note that several post-*Pioneer* cases have indeed taken the approach which we believe is appropriate. Most notable is *Beltrami, supra*, in which the court found that the filing of a claim over two years after the bar date, even though there was no dispute as to the propriety of the notice of the bar date, was found to be excusable because the case was still at an early stage and no prejudice to the debtors was identified. 178 B.R. at 392.

Similarly, in *In re Earth Rock, Inc.*, 153 B.R. 61 (Bankr.D.Idaho 1993), the court excused a late claim filing, even though the

creditor's attorney, who received proper notice of the bar date, simply neglected to timely file a claim, resulting in the filing of a claim almost eight months after the bar date. *Id.* at 61–63. Although recognizing that *Pioneer*, —— U.S. at ——, 113 S.Ct. at 1499, expressly rejected the notion that an attorney's negligence could not be attributed to the claimant-creditor, the court, finding the notice of the bar date somewhat unclear, *id.* at 64, and "little, if any, prejudice to the Debtor, if the proof of claim were to be allowed as timely," *id.* at 63, decided this "close case" in favor of the creditor. *Id.* at 64.

In several other cases, courts have similarly allowed late claims to be filed despite doubtful arguments of inadequate notice and objective justification for respective late filings because little, if any, prejudice to the debtor was identified. *See In re Eagle Bus Mfg., Inc.*, 62 F.3d 730, 737–40 (5th Cir.1995) (allowances of claims filed several months after the bar date were mostly affirmed because the court refused to credit the debtor's claim of prejudice because all of the claims in issue would be paid from a limited pool of funds); *In re R.H. Macy & Co.*, 166 B.R. 799 (S.D.N.Y.1994) (denial of request for allowance of a late filing remanded for further consideration of prejudice beyond the issue of whether a claim depletes the debtor's estate); *Linder v. Trump's Castle Associates*, 155 B.R. 102, 108 (D.N.J.1993) (denial of a request to allow a late filing remanded despite the debtor's claim that the bar date notice was properly mailed); *In re Visiting Nurse Ass'n*, 176 B.R. 748 (Bankr.E.D.Pa. 1995) (Internal Revenue Service's claim filed one day late permitted despite being attributable to the claimant's own failure to properly handle the claim); *In re Dartmoor Homes, Inc.*, 175 B.R. 659, 666–69 (Bankr. N.D.Ill.1994) (although creditor found equally blameworthy with the debtor in causing the late filing of a claim, the lack of negative impact upon the debtor was considered in allowing a late filing); *In re Byrne*, 162 B.R. 816 (Bankr.W.D.Wis.1993) (debtors permitted to belatedly file a claim on behalf of the IRS, noting that they obviously did not consider themselves prejudiced by their own filing); and *In re New York Trap Rock*

*Corp.*, 153 B.R. 642, 646–47 (Bankr.S.D.N.Y. 1993) (court refused to enjoin the late filing of an environmental claim which was not discovered by the creditor until after the bar date). Other cases have allowed late filings when there was an issue of lack of notice to the claimant. *In re Hillsborough Holdings Corp.*, 172 B.R. 108, 111–12 (Bankr.M.D.Fla. 1994); *In re Pettibone Corp.*, 162 B.R. 791, 806–09 (Bankr.N.D.Ill.1994); *In re Osman*, 164 B.R. 709, 715 (Bankr.S.D.Ga.1993); and *In re B.C. Enterprises, Ltd.*, 160 B.R. 827, 831–32 (Bankr.D.Ariz.1993).

On the other hand, there are several post-*Pioneer* cases in which, despite the presence of *Pioneer*, the filing of late claims has been refused. In a large percentage of these cases, the court was able to identify prejudice to the debtor as a result of the filing. *See In re Alexander's Inc.*, 176 B.R. 715, 721–22 (Bankr.S.D.N.Y.1995); *In re Rose's Stores, Inc.*, 165 B.R. 410, 412 (Bankr.E.D.N.C. 1994); *In re Specialty Equipment Cos.*, 159 B.R. 236, 240 (Bankr.N.D.Ill.1993); and *In re Trump Taj Mahal Associates*, 156 B.R. 928, 937–38 (Bankr.D.N.J.1993).

In two other cases, the courts declined attempts to extend bar dates after the respective claimants were found to have made conscious, tactical decisions not to file a timely claims. *See In re Bicoastal Corp.*, 176 B.R. 966, 971–72 (Bankr.M.D.Fla.1994); and *In re Mother Hubbard, Inc.*, 152 B.R. 189, 193–94 (Bankr.W.D.Mich.1993).

Less easily explained are several decisions in which courts refused to allow late claims to be filed despite a failure to find either prejudice to the debtor or any tactical decision of the creditor to make a late filing, mostly because they believed that the respective claimants had not provided an adequate excuses for the late filings. *See In re Au Coton, Inc.*, 171 B.R. 16, 18 (S.D.N.Y.1994); *In re Guild Music Corp.*, 163 B.R. 17, 18 (Bankr.D.R.I.1994); and *In re Eagle–Picher Industries, Inc.*, 158 B.R. 713, 715–16 (Bankr.S.D.Ohio 1993). We question whether these decisions are in step with the spirit of *Pioneer*.

Of primary significance in our application of the principles established in *Pioneer* to the

instant facts is the Debtor's inability to establish any prejudice to it as a result of the Borough's late filing of its claims. To a large extent, this lack of prejudice follows from the status of this case as a liquidating Chapter 11 of a closed hospital. In such a circumstance, there is no reorganizational plan or purpose which is served by a claims bar date. Allowance of a late claim, in such circumstances, will generally merely result in a slightly different distribution of a liquidating debtor's assets. Exactly how the debtor's assets are distributed is ultimately of little consequence to the debtor, so long as the claim is not filed so late as to disrupt the distribution process. *Compare In re Wilson,* 1993 WL 78214 (Bankr.E.D.Pa. March 15, 1993), *aff'd,* 1993 WL 483326 (E.D.Pa. Nov. 16, 1993); *In re B. Cohen & Sons Caterers, Inc.,* 147 B.R. 369, 375–78 (Bankr.E.D.Pa.1992); and *In re Sturm,* 121 B.R. 443, 449–50 (Bankr.E.D.Pa. 1990) (attempts to file claims after distributions of assets were completed were rejected).

Here, the Borough's claim filing, while several months after bar date, was effected prior to confirmation of the Debtor's liquidating plan, and therefore prior to the Debtor's making any distribution pursuant to its liquidating plan. Therefore, the "danger of prejudice to the debtor" and the impact of the Borough's delay in filing its proof of claim upon the proceedings in this case is practically nil. In such circumstances, the Debtor could not, and therefore did not, make any claim of prejudice as a result of the Borough's late filing.

■ We believe that the issue of prejudice to the Debtor as a result of the late filing is the primary consideration which must be made in the *Pioneer* analysis. Our conclusion that there is no danger of prejudice to the Debtor's interests whatsoever as a consequence of the Borough's late filing therefore goes a long way towards winning the day for the Borough in the matter before us.

*Pioneer* does, of course, allow for consideration of the reason for the delay, in particular whether a timely filing was within the control of the claimant and whether the claimant acted in good faith. There is no evidence of any conscious or tactical decision of the Bor-

ough to file a late claim which might raise any issue of bad faith.

There is evidence that the MTB's proffered justification for the late filing is dubious. Certainly, the Borough was quite aware of the Debtor's bankruptcy filing. There is no question that it received proper notice of the bar date. We expressly reject the argument presented by Schmanek which suggested that the Debtor acted deceptively or in any way improperly in forwarding two second quarter 1994 returns to the MTB. Rather, we believe that the Debtor's filing of a separate Pre–Petition Return and Post–Petition Return was not only appropriate, but necessary. We also note that the small remittance reflected in the Post–Petition Return, clearly labelled as such, should have constituted a "red flag" sufficient to put the MTB on notice that the Debtor had a second quarter 1994 deficiency. The Debtor properly suspended payment of the Pre–Petition Return for this quarter until the time when it would make distribution to pre-petition creditors in its plan.

In addition, we cannot attribute much, if any, weight to Schmanek's claim that the MTB failed to receive the Pre–Petition Return. Cunningham produced a copy of Wieand's letter which covered the Pre–Petition Petition and was sent to Arnaiz, an MTC employee, at her correct address. Despite Arnaiz's credible testimony that she did not recall Wieand's contact and was not the appropriate recipient of the letter and Return, it seems likely to us that Wieand received instructions from some MTB employee, be it Arnaiz, who has simply understandably forgotten this encounter, or any other MTB employee, to send the letter and Return as he did. In light of Arnaiz's description of the procedures established by the MTB for receipt of its mail, which included its opening and routing by mailroom employees, it is understandable why she did not receive the Return. However, the presumption that mail properly sent and addressed and not returned has reached its intended destination causes us to conclude that the Return was received by the MTB and misrouted by its mailroom or administrative employees. *See Hagner v. United States,* 285 U.S. 427, 430,

52 S.Ct. 417, 418–19, 76 L.Ed. 861 (1932); *In re Lewis,* 157 B.R. 555, 561 (Bankr.E.D.Pa. 1993); and *In re Ryan,* 54 B.R. 105, 106–07 (Bankr.E.D.Pa.1985).

On the other hand, Wieand was not called to testify. As a result, testimony was lacking regarding the proper mailing of the letter covering the Return, as well as explanations as to why he sent the letter to Arnaiz and why the letter was in fact dated several days before Cunningham signed the Return.

The MTB's explanation of the reason for the delay is therefore not overwhelming in its attempt to establish legitimate excuse for its failure to timely discern the Debtor's second quarter 1994 delinquency and file a timely proof of claim for same. However, it. is unclear whether the MTB's deficiencies were within the control of the Borough. There is no evidence that the Borough itself retained any role in the collecting of its EIT Taxes. Instead, the MTB was assigned this responsibility. Thus, the reason for the delay may not have been in the reasonable control of the Borough, as well as being in good faith.

However, in any event, attribution of the reason for the delay to the Borough should not outweigh the total lack of prejudice to the Debtor in our analysis of the equitable circumstances which the *Pioneer* court directs that we consider. We will therefore allow the Borough an extension of the bar date to belatedly file its claim in this case, although we will reduce the Borough's claim to the amount which the parties now agree is appropriate, *i.e.,* $40,165.37.

### D. CONCLUSION

An Order reducing the Borough's priority tax claim to $40,165.37, but otherwise overruling the Objection, will be entered.

### ORDER

AND NOW, this 28th day of September, 1995, after a hearing of September 6, 1995, on the Objection ("the Objection") of the Debtor to the late-filed claim ("the Claim") of the Borough of Norristown ("the Borough") (No. 516), and upon consideration of the parties' respective post-trial submissions, it is

hereby ORDERED AND DECREED as follows:

1. The Objection is SUSTAINED in part only.

2. The Claim of the Borough is allowed as an unsecured priority claim in the amount of $40,165.37.